Todd A. Zilbert, OSB No. 89144
Email: taz@woodtatum.com
Robert I. Sanders, OSB No. 70125
Email: ris@woodtatum.com
Wood Tatum
6915 SW Macadam Avenue, Suite 115
Portland, OR 97219
Telephone: (503) 224-5430
Facsimile: (503) 241-7235

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| VIGOUR SHIPPING SDN. BHD., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> P AND S INTERNATIONAL, INC., an Oregon ) <br> corporation, and PAUL E. LEWIS, an Oregon ) <br> resident, ) <br> ) <br> Defendants. ) | Case No. 3:11-CV-842-BR <br><br> **IN ADMIRALTY** <br><br> [PROPOSED] **ORDER CONFIRMING FOREIGN ARBITRAL AWARD** |

THIS MATTER came before the Court on September 28, 2011, for a hearing on the motion of Plaintiff, Vigour Shipping Sdn. Bhd., for an order (1) confirming a foreign arbitral award issued in its favor against defendant P and S International, Inc., (2) granting judgment on the confirmed award, and (3) authorizing discovery in aid of execution. Todd Zilbert of Wood Tatum appeared on behalf of plaintiff. Neither defendant has appeared, but the Court received two letters submitted by M. Christie Helmer of Miller Nash, LLP, attorneys for defendant P and

Page 1 – ORDER CONFIRMING FOREIGN ARBITRAL AWARD

S International, Inc., in the foreign arbitration, advising the court that defendants would not appear and would not oppose plaintiff's motion.

The Court heard argument and reviewed plaintiff's submissions and the correspondence of Ms. Helmer. It appears that plaintiff is entitled to an order confirming the foreign arbitral award, but that the record is insufficiently developed to grant judgment as to fewer than all parties pursuant to Rule 54(b), or to authorize discovery pursuant to Rule 69(a)(2), of the Federal Rules of Civil Procedure. Therefore,

IT IS HEREBY ORDERED that:

1. Plaintiff's motion for confirmation of foreign arbitral award is GRANTED. A copy of the confirmed award is attached as Exhibit 1 to this Order.

2. Plaintiff's motion for an order granting judgment on the confirmed award is DENIED, with leave to renew.

3. Plaintiff's motion for an order authorizing discovery in aid of execution is DENIED, with leave to renew.

4. Plaintiff shall submit a status report on or before November 3, 2011.

DATED this 30th day of September, 2011

_____
The Honorable Anna J. Brown
UNITED STATES DISTRICT JUDGE


SUBMITTED BY:   /s/ Todd A. Zilbert
                Todd A. Zilbert, OSB No. 89144
                WOOD TATUM
                Telephone: (503) 224-5430
                Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing PROPOSED ORDER CONFIRMING FOREIGN ARBITRAL AWARD on the following parties:

M. Christie Helmer
Miller Nash LLP
111 SW 5th Ave Ste 3400
Portland, OR 97204

by E-mail a true and correct copy hereof to said parties on the date below:

DATED this 29th day of September 2011.

WOOD TATUM

/s/ Todd A. Zilbert
Todd A. Zilbert, OSB No. 89144
Robert I. Sanders, OSB No. 70125
6915 SW Macadam Avenue, Suite 115
Portland, Oregon 97219
Telephone: (503) 224-5430
Fax: (503) 241-7235
E-mail: taz@woodtatum.com
ris@woodtatum.com

# m.v. "ECO VANGUARD"

## Charter Party dated Auckland 14th July 2010

## FINAL ARBITRATION AWARD

Exhibit 1
1 of 17

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN

## Vigour Shipping Sdn Bhd
## of Malaysia

                      **Claimants**
                      **(Owners)**

## AND

## P and S International Inc.
## of Dallas, Oregon, USA

                      **Respondents**
                      **(Charterers)**

### m.v. "Eco Vanguard"

### Charter Party dated Auckland 14th July 2010

### FINAL ARBITRATION AWARD

**WHEREAS:**

1. By the terms of a voyage fixture dated 14th July 2010 on a BEIZAI (AMERICAN LOGS/LUMBER) 1991 Charter Party form (Amended March 1 1995), with amendments and additions (hereinafter referred to as "the Charter Party"), the Claimants (hereinafter referred to as "the Owners") chartered the Malaysian flag motor vessel *"Eco Vanguard"* (hereinafter referred to as "the vessel") to the Respondents (hereinafter referred to as "the Charterers") for a voyage from Eureka, USA to Changshu PRC to carry *"A full and complete cargo of logs (debarked)"* with laydays and cancelling ;25th July/7th August 2010. The agreed rate of freight was *"US$1,330,000 lumpsum FIOST basis 1:1 for China Discharge"*.

2. In the event, the vessel loaded the cargo in Eureka between 28th July and 17th September 2010 and discharged in Changshu between 8th October and 23rd October 2010.

3. Disputes arose between the parties regarding the Owners' claim for demurrage accrued at Eureka of US$471,787.98 and demurrage accrued at Changshu, alternatively damages, in the amount of US$289,400.11.

4. The BEIZAI Charter Party provided for arbitration in London with the following clauses:-

" *17. Place of Arbitration (optional) (Cl. 31) LONDON*"

"*31. Arbitration (See also Clause 55)*"

"*CLAUSE 55   ARBITRATION*

*Any dispute arising from this Charter shall be submitted to arbitration held in London in accordance with the provisions of the Maritime Arbitration Rules of the United Kingdom, and the award given by the arbitrators shall be final and binding on both parties. Each party shall nominate an arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision is final. The arbitrators shall be commercial men conversant with shipping and attorneys, barristers, solicitors and legal men shall be excluded. Any claim must be made in writing and claimant's arbitrator appointed within three months of completion of discharge otherwise all claims shall be deemed to be waived.*"

"*CLAUSE 56   LAW*
*This Charter Party to (sic) governed by English Law.*"

5. As recorded in Clauses 17, 31, 55 and 56 of the Charter Party, as above, London was chosen as the place of arbitration and the Arbitration Act 1996 and the relevant statute apply to this dispute. In accordance with Section 3 of the Act, the seat of the arbitration is in England and the arbitration proceedings are governed by English law.

2

Exhibit 1
3 of 17

6. The Owners were represented in these arbitration proceedings by solicitors in Hong Kong (hereinafter referred to as "the Owners' solicitors"). The Charterers were represented by solicitors in Portland, Oregon, (hereinafter referred to as "the Charterers' solicitors").

7. Disputes having arisen, the Owners appointed me, the undersigned Colin Peerless of Bywater House, Littley Green, Chelmsford, Essex CM3 1BU on 17th November 2010 as the arbitrator nominated by them in respect of any and all disputes arising from the Charter Party. The Owners notified the Charterers of my appointment by fax on 19th November 2010 and confirmed that I had accepted that appointment on current LMAA Terms. The Owners invited the Charterers to agree that I act as sole arbitrator in the reference *"failing which they should appoint their own arbitrator within 14 days of today's date pursuant to Clause 55 and Section 16 of the Arbitration Act 1996."*

8. The Charterers failed and/or refused to appoint their own arbitrator within 14 days and therefore, on 16th December 2010, the Owners' solicitors sent the Charterers a further notice by fax pursuant to Section 17 of the Arbitration Act in which they stated *"Therefore, please take notice, pursuant to Section 17 of the Arbitration Act, that:*
   *(a) Unless* [the Charterers] *appoint their own arbitrator, and notify us of that appointment, within 7 clear days of today's date, our clients will appoint their own arbitrator, Mr Peerless, as sole arbitrator in the reference.*
   *(b) In the event that Mr Peerless is appointed sole arbitrator, his award will be binding on* [the Charterers] *as if his appointment had been made by agreement."*.

9. On 10th January 2011, the Owners advised me that *"Despite this notice, 7 clear days, and a further short period have elapsed without* [the Charterers] *having appointed their own arbitrator. In the circumstances, we hereby appoint you as sole arbitrator in the reference pursuant to our clients' rights under section 17(2) of the Arbitration Act 1996."*.

10. On the same day, 10th January 2011, I accepted the appointment as sole arbitrator in the reference under section 17(2) of the Arbitration Act 1996 and the current LMAA Terms.

11. On 30th April 2011, by e-mail, the Owners' solicitors served their clients' Claim Submissions, with supporting documents, and these were copied to the Charterers.

3

Exhibit 1
4 of 17

12. Also on 30th April 2011, by e-mail, I acknowledged the Claim Submissions and, by a copy of the same message, notified the Charterers, inter alia, as follows:-

    *"In accordance with the LMAA terms, which govern this reference, you should serve your Defence and Counterclaim, if any, within 28 days of the service of the Claim Submissions. I therefore set the date for such service as close of business in London on Monday 30th May 2011. Should you require any additional time for such service, you should ask me for an extension BEFORE 30th May 2011. If you need any assistance with the LMAA procedure governing this arbitration, please do not hesitate to ask me.".* I also assured the Respondents that, although I was the sole arbitrator, that did not prevent them for taking part in the reference and I urged them to do so. I also confirmed that LMAA arbitrators always act impartially, irrespective of who appoints them, and that any eventual Award will be based entirely on the merits of the submissions served before me.

13. On 24th May 2011, I received an e-mail from solicitors in Portland, Oregon, [hereinafter referred to as "the Charterers' solicitors"], copied to the Owners' solicitors, explaining that they were now representing the Charterers in this reference and that although they had received some of the materials in advance, they had only been able to meet their clients on 20th May. They asked for an extension of time to serve the Charterers' Defence until 30th June 2011.

14. In response to this message, the Owners' solicitors sent an e-mail on the same day, copied to the Charterers' solicitors, objecting to the length of the extension requested and complaining that the Charterers had known about the claim for several months but only just appointed their solicitors. Nevertheless, they were willing to grant an extension of *"say 10 days"*.

15. I replied to these messages on the same day expressing my concern at the need for an extension in view of the length of time since the claim had arisen. However, I made an ORDER for service of the Charterers' Defence and Counterclaim, if any, to be served by close of business in London on Friday 17th June. I further warned the Charterers' solicitors that any failure to comply with the date of this extension was likely to be followed by a Final and Peremptory Order of short duration.

16. On 31st May, the Owners' solicitors sent an e-mail to the Charterers' solicitors in which they pointed out that the Charterers had only referred to a portion of the demurrage at the

4

Exhibit 1
5 of 17

discharging port and suggested that it was apparent that the Charterers did not dispute the demurrage incurred at the loading port. They further asked if there was any reason why the Tribunal should not make an interim final award in relation to the demurrage at the loading port stating that *"In the absence of an compelling explanation from P & S [the Charterers] as to why this should not be the case, I ask that the Tribunal move to an interim final award in our clients (sic) favour with respect to the loadport demurrage which is due and owing."*.

17. In response, also on 31st May, I asked the Charterers' solicitor for their comments on the above application for an interim final award and they replied on 3rd June 2011 that they had been unable to obtain all the information they required from their clients and could not therefore confirm that the loading port demurrage was undisputed. They also added that *"We do not disagree that, to the extent appropriate under the Rules, an Interim Final Award may be entered on Claimant's evidence separately submitted or on Respondent's admission when it is in a position to do that."*.

18. I replied on 4th June, with a copy to the Owners' solicitors, by pointing out that the reference was commenced in November 2010 and that I would have hoped that the Charterers had found the time to check the Owners' demurrage calculations. However, I accepted that as service of the Charterers' Defence was due by 17th June 2011, then I was prepared to await that service before making a decision about the Owners' application for an Interim Final Award.

19. On 17th June 2011, by e-mail, the Charterers' solicitors stated that *"While P and S [the Charterers] firmly believes that a portion of the demurrage is not in fact owing (in particular, a portion of the demurrage at the discharge port), it has determined for business reasons not to present a Defence. Accordingly, one will not be presented."*.

20. The Owners' solicitors responded by e-mail on the same day pointing out that the delays at the discharging port were incurred by reason of their clients having to exercise their rights of lien under the Charter Party in order to obtain payment of freight owing to them. They asked that the Tribunal should proceed to its award for the full amounts claimed, plus interest and costs.

21. I am satisfied that the Charterers were given every opportunity to submit a Defence to the Owners' claim but, for the reasons given above, chose not to do so.

5

Exhibit 1
6 of 17

22. I replied to the parties by e-mail on the same day, stating that *"In the absence of any Defence, I shall now proceed to my Award in this reference on the basis of the submissions and documents now before me, to the exclusion of all others..."*.

## REASONS FOR THE FINAL ARBITRATION AWARD

23. The Owners' claim arose out of a Charter Party for a voyage from Eureka, USA to Changshu in the Peoples' Republic of China in July to October 2010. The vessel loaded a cargo of logs (debarked) but the Owners alleged that the Charterers exceeded the laytime allowed to them, both at the loading port and the discharging port. The Owners' claim was for demurrage at both ports in the following amounts:-

At Eureka, demurrage amounted to US$471,787.98 and, at Changshu, the Owners claimed for demurrage, alternatively damages in the sum of US$289,400.11. In addition, the Owners claimed interest on all the sums awarded, together with further or alternate relief and costs.

24. The Charter Party contained, inter alia, the following clauses:-
    Box 11   *"Freight rate and method of payment, currency, etc., (Cl. 3)*
             *US$1,330,000 lumpsum FIOST basis 1:1 for China Discharge"*
    Box 12.1 *"Total laytime for load. And disch. (Cl. 4)*
             *16 days all purposes per weather working day Sundays and holidays excluded unless used."*
    Box 13   *"Demurrage rate (Cl. 8)*
             *US$18,000"*
    Box 18   *"Shipbroker and brokerage (Cl. 28)*
             *1.25% Addcom.........Charterers have privilege to deduct their address commission from their freight payment."*

    (Clause) *"3. Freight (also see clause 67)*
             *Freight shall be prepaid by the Charterers as specified in Box 11 in cash, without discount and non-returnable. Freight shall be deemed earned upon completion of loading, the vessel and / or cargo lost or not lost."*.

6

Exhibit 1
7 of 17

(Clause) *"4. Laytime (See also Clause 35)*

*(a) Total laytime for loading and discharging*

*The cargo shall be loaded, stowed, lashed, ~~unlashed~~, trimmed and discharged within weather working days of 24 consecutive hours as stated in Box 12.1 Sundays and Holidays excluded ~~excepted~~, unless used at the loading port(s), and at the discharging port(s) Sundays and Holidays excluded ~~excepted~~ unless used. If used, actual working time shall count as laytime. Setting up ~~and down~~ stanchions and catwalk, and putting dunnage shall count as laytime."*

(Clause) *"5. Commencement of laytime (See also Clause 35)*

1) *Notice of Readiness at the loading or discharging port shall be given to the Charterers or their nominees stated in Box 9.1 or Box 9.2 respectively.* [Boxes 9.1. and 9.2 referred to Clause 35]

2) *Laytime shall commence at 1 p.m. if notice of readiness to load or discharge is given at or before noon and at 8.a.m. next working day if notice given at or before 5 p.m. whether in berth or not."*

(Clause) *"8. Demurrage, Despatch Money*

*Demurrage shall be paid to the Owners at the rate as agreed in Box 13 per day of 24 running hours or pro rata for any part thereof, payable day by day, for all time used in excess of laytime at loading or discharging port(s)...."*

(Clause) *"23. Lien*

*The Owners shall have a lien on the cargo for all freight and all other expenses in relation to the transport, deadfreight, demurrage, damages for detention, general average and salvage. The Charterers shall remain responsible for above items to such extent only as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo."*.

(Clause) *" 27. Agency (See also Clause 35)*

*The Vessel shall be consigned to the ~~Charterers~~ Owners' agents both at loading and discharging ports."*

7

Exhibit 1
8 of 17

(Clause) *"28. Brokerage*

> *A brokerage commission at the rate stated in Box 18 on the freight and demurrage earned is due to the brokers mentioned in Box 18, by the Owners."*

**"CLAUSE 35    NOTICE OF READINESS AT LOAD AND DISCHARGE PORTS**

> *......Master to tender Notice of Readiness (NOR), WIBON WCCON WIFPON and shippers /receivers to accept NOR upon vsls arrival at all ports. NOR to be tendered within Office hours.*
> *At Load Port, Office hours are 0900-1700 HRS MON-FRI, 0900-1200HRS SAT. No office hours on Sunday and holidays.*
> *At Discharge Port, Office hours are 0900-1700HRS MON-FRI, 0900-1200HRS SAT. No office hours on Sunday and holidays....."*

**"CLAUSE 36    DEMURRAGE**

> *Demurrage monies if any to be settled and paid for in cash in US currency within 30 days of receipt of supporting documentation.*
> *Should vessel be on demurrage by the time the vessels (sic) arrives at the next port, then time on demurrage continues on vessels (sic) considered arrival."*

**"CLAUSE 50    COMPLETION OF LAYTIME**

> *Laytime/demurrage at Laytime/demurrage (sic) at loading port(s) to end on completion of lashing."*

**"CLAUSE 67    FREIGHT PAYMENT and BILLS OF LADING**

> *Freight to be 100% prepaid into Owners (sic) bank account within 3 banking days (free of bank charge) after completion of loading. Bills of lading will not be released until the freight payment is received in the Owners (sic) bank account. Bills to be marked 'Freight paid as per Charter Party' "*.

25. The vessel arrived at the Eureka Pilot Station at 12.00 hours on 28th July 2010 and tendered Notice of Readiness at the same time, by e-mail. Apparently because of a shortage of cargo, the vessel did not commence loading until 09.18 hours on 6th August and, after various delays, completed loading at 19.00 hours on 17th September 2010.

26. The vessel then proceeded to Changshu where she dropped anchor at the C.J.K. Anchorage at 07.45 hours on 8th October 2010 and tendered Notice of Readiness at the same time. Discharging was completed at 14.30 hours on 23rd October 2010 and the vessel sailed from Changshu at 08.37 hours on 24th October 2010.

**THE LOADING PORT**

27. Although the vessel had arrived at the Eureka Pilot Station at 12.00 hours on 28th July, she did not shift to the loading berth, Fairhaven Terminal, until 13.26 hours on 5th August. The Statement of Facts, drawn up by General Steamship Corporation of Emeryville [who were apparently the Owners' port agents in accordance with Clause 27 above], showed that the loading was interrupted for a number of reasons until completion on 17th September and, according to the Owners, the allowed laytime of *"16 days all purposes"* allowed in Box 12.1 was considerably exceeded.

28. The Owners claimed that the Charterers had exceeded the allowed laytime of 16 days all purposes by 32.1681 days at the loading port, resulting in demurrage at the agreed Charter Party rate of US$18,000 per day and pro rata, of US$579,025.80. After allowing for the deduction of 1.25% address commission (as per Box 18 of the Charter Party, as above) and funds of US$100,000 received on 23rd September 2010, the amount claimed as outstanding by the Owners was US$471,787.98.

29. I have calculated the laytime and demurrage from the Statement of Facts, drawn up by the port agents, independently of the Owners' calculations and, upon checking the Owners' Laytime Statement, FIND them to be correct. I have therefore awarded the Owners the amount of their claim for loading port demurrage of US$471,787.98.

30. It appears that problems arose in connection with the payment of freight and the Bills of Lading. Even though the freight was due *"within 3 banking days (free of bank charge) after completion of loading."* (Clause 67), the freight was not paid on or before this date of 23rd September 2010. In fact, by 6th October 2010, only two days before the vessel's arrival at the discharging port, the Owners claimed that they had still not received either the freight or the loading port demurrage.

9

Exhibit 1
10 of 17

31. Pursuant to their rights under Clause 67, as above, the Owners had retained the original Bills of Lading numbered EV100810001, EV100810002 and EV100810003 pending payment and receipt of the freight.

32. In addition, the Owners became aware that, whilst they held the original Bills of Lading, a further unauthorised and/or fraudulent set of Bills of Lading was being circulated. It was noticeable that whilst the Original Bills of Lading were marked "FREIGHT PAID AS PER C/P", the unauthorised set were marked "FREIGHT PREPAID".

33. By fax and e-mail on 6th October 2010, the Owners notified the Charterers that the vessel would shortly be arriving at the discharging port, Changshu, and that they were concerned that neither the freight nor the loading port demurrage had been paid. They warned the Charterers that *"Should Owners not have received payment of the freight and demurrage before the vessel reaches Changshu, Owners hereby give notice that they intend to exercise their rights of lien over the cargo."*. They also notified the Charterers that they were aware that certain Bills of Lading that purported to be the original Bills of Lading were circulating and confirmed that *"Owners have not authorised the release or issue of any Bills of Lading pursuant to the terms of the Voyage Charter, or in respect of the cargo currently onboard."*. The Owners stated in the message that *"It is in the interests of all concerned that prompt payment of the freight and demurrage be made. We therefore look forward to receiving your confirmation in this respect as a matter of urgency."*.

34. The Charterers responded on the same day, by e-mail, in which they confirmed that *"The b/l in question of course was only for the purpose of banking and as the agents/brokers/end users/buyers were aware of, owners b/l's would replace any and all before discharge began. This sort of system had been done many times for many million usd and is accepted by negotiating banks....To summarize, I ask for owners to please abide with the above, send the "Formal Note" as requested by the buyer and wait through tomorrow."*. It would appear that the "Formal Note" requested from the Owners would state that *"once ocean freight is paid on the Eco Vanguard, discharge may begin."*. The Charterers further went on to state that *"Of course, everything at this minute depends on buyer paying so payment is forwarded to owners for the ocean freight. If that is not done, then there is not much use in talking about demurrage payment or future business of which the shipment was set up to accomplish and even under these crazy problems, is still available for the future."*.

35. On 8th October 2010, the Owners sent a further e-mail to the Charterers in which they stated that *"Owners confirm that they intend acting in accordance with their rights and obligations under the Voyage Charter and in respect of the cargo. In particular, Owners confirm:*

    *(i)    That they have issued Bills of Lading as requested; and that*

    *(ii)   They will release these Bills of Lading, and will deliver the cargo, as soon as they receive payment of the outstanding sums due to them."*.

    In conclusion, they reserved all of Owners' rights under the Charter Party and in respect of the cargo.

36. As noted above, when the vessel arrived at Changshu at 07.45 hours on 8th October 2010, neither the freight nor the loading port demurrage had been paid. In consequence, the Owners gave notice and exercised a lien over the cargo on board *"pursuant to their rights under Clause 23 of the Charterparty."*. The Owners submitted a copy of that Notice of Lien, sent to the Charterers on 10th October 2010, and further stated that *"Owners require that payment of the above mentioned amounts for freight and demurrage* [freight in the sum of US$1,313,375.00 and demurrage in the sum of US$479,025.80] *be made immediately to their bank account. Should Owners not receive payment of the abovementioned amounts for freight and demurrage, as well as demurrage that has subsequently accrued, they will be entitled to apply to the Chinese Courts for the sale of the cargo. Irrespective of their rights of lien to obtain payment, Owners are not obliged to release the cargo to any receivers in the absence of the original authorised Bills of Lading."*.

37. It was obvious to the Tribunal that any delay that occurred during discharge at Changshu was entirely due to the Charterers' failure to pay the freight in accordance with the terms of the Charter Party and thus the Charterers were liable for any such delay.

**THE DISCHARGING PORT**

38. The vessel arrived at CJK anchorage Changshu at 07.45 hours on 8th October 2011 and tendered Notice of Readiness at the same time. Although the Statement of Facts submitted by the Owners was not entirely clear, it appears that the vessel shifted anchorages again on 18th October. She then shifted from the anchorage to the berth on 20th October, commenced discharge at 18.36 hours on the same day and completed discharge at 14.30 hours on Saturday

11

Exhibit 1
12 of 17

23rd October. As the vessel was already on demurrage on arrival at the discharging port, in accordance with Clause 36, as above, the time counts from arrival.

39. As with the loading port, I have calculated the demurrage from the Statement of Facts, drawn up by the port agents, independently of the Owners' calculations. However, upon checking the Owners' Laytime Statement, I disagreed with their calculations on two points.

a) Whilst the shifting between anchorages continues to count as demurrage, the time spent shifting from the anchorage to the berth does not count. Clause 52 below covers this point.

*"CLAUSE 52    VESSEL'S SHIFTING*

*Shifting from quarantine/place of waiting or pilot anchorage area to loading or discharging berth to be for Owners' account and time not to count. However, costs and time used for unusual shifting, hauling alongside dock and or re-shifting requested by Charterers after the Vessel has berthed to be for Charterers* (sic) *account.".*

There was no indication in that clause that *"time not to count"* only applied to laytime and it must therefore also suspend time on demurrage. However, I consider that the shifting time between anchorages was "unusual" shifting and should count as time on demurrage.

b) The Owners' laytime statement gives the time for completion of discharge as 14.30 hours on Sunday 24th October whereas the Laytime Statement of Facts prepared by the port agents shows that discharging was actually completed at 14.30 hours on Saturday 23rd October 2010. In fact, the vessel sailed from Changshu at 08.37 hours on 24th October 2010.

40. Consequently, I have reduced the Owners' claim for demurrage at the discharging port by these two items and FIND that the Owners are entitled to gross demurrage at Changshu of US$274,100.40 which, less the 1.25% address commission allowed for in the Charter Party, amounts to US$270,674.14. I have so awarded.

41. Appendix 'A', which is attached to and forms part of this Award, shows my demurrage calculations for the discharging port.

12



Exhibit 1
13 of 17

42. My findings result in demurrage being due to the Owners in the amount of US$742,462.12 and no more.

43. In addition to their claim above, the Owners claimed:-
    *"(c) Interest on all sums awarded;*
    *(d) Further or alternative relief; and*
    *(e) Costs."*

    They also asked *"that the Tribunal exercise its discretion to award interest at a rate of USD Prime rate, plus 1% per annum, compounded with quarterly rests."*

44. The Arbitration Act 1996 Section 49 gives the Tribunal the power to award simple or compound interest from such dates, at such rates and with such rests as it considers meets the justice of the case. The Tribunal found that the rate of interest appropriate in this dispute was 3.00% per annum and pro rata, compounded on a quarterly basis, from 22nd November 2010 (being 30 days after completion of discharge) until the date of payment.

45. There being no reason to depart from the general rule that costs should follow the event, I have also awarded the Owners their costs on the standard basis.

    **NOW I**, the undersigned Colin Peerless, having taken upon myself the burden of this reference as sole arbitrator and having considered the written evidence and submissions made to me **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL ARBITRATION AWARD** as follows:-

A) **I FIND AND HOLD** that the Owners' claim succeeds in the sum of US$742,462.12 and no more.

B) **I AWARD AND DIRECT** that the Charterers shall forthwith pay to the Owners the sum of US$742,462.12 (Seven Hundred and Forty Two Thousand Four Hundred and Sixty Two United States Dollars and Twelve Cents), together with interest thereon at the rate of 3.00% per annum and pro rata, compounded on a three monthly basis from 22nd November 2010 (being 30 days after completion of discharge) until eventual payment by the Charterers.

C) **I FURTHER AWARD AND DIRECT** that the Charterers shall bear and pay their own and the Owners' costs of the reference (the Owners' costs of the reference to be determined by me if not agreed, for which determination I hereby reserve my jurisdiction) and that the Charterers shall bear and pay the costs of this my Final Award in the sum of £3,650.00 (Three Thousand Six Hundred and Fifty Pounds Sterling), inclusive of my fees, interlocutory charges and disbursements **PROVIDED,** however, that if, in the first instance, the Owners shall have paid all or any part of the costs of this my Final Award, they shall be entitled to an immediate reimbursement by the Charterers of the sum so paid, together with interest thereon, calculated at the rate of 3.25% per annum and pro rata, compounded on a three monthly basis, calculated from the date of payment until the date of reimbursement.

**GIVEN** under my hands this....20th....day of....June....2011.

..................................................  ..................................................
COLIN PEERLESS                                    WITNESS

14

Exhibit 1
15 of 17

# APPENDIX 'A'

m.v. "Eco Vanguard" - C/P 14.7.2010 -     Laytime Statement – CHANGSHU

Discharging laytime allowed - Vessel arrived already on demurrage

Demurrage US$18,000 per day and pro rata

### CHANGSHU

| | |
|---|---|
| Arrived Pilot Station | 07.45 hours Friday 8th October 2010 |
| NOR tendered | 07.45 hours Friday 8th October 2010 |
| Pilot on board | 16.03 hours Wednesday 20th October 2010 |
| All fast alongside | 17.20 hours Wednesday 20th October 2010 |
| Commenced discharging | 18.36 hours Wednesday 20th October 2010 |
| Completed discharging | 14.30 hours Saturday 23rd October 2010 |

| Date. | Time. | Time Used | Demurrage | Remarks |
|---|---|---|---|---|
| 8th Oct Fri   | 07.45 - 24.00 | 00 - 16 - 15 | 00 - 16 - 15 | |
| 9th Oct Sat   | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 10th Oct Sun  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 11th Oct Mon  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 12th Oct Tue  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 13th Oct Wed  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 14th Oct Thur | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 15th Oct Fri  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 16th Oct Sat  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 17th Oct Sun  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 18th Oct Mon  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 19th Oct Tue  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 20th Oct Wed  | 00.00 - 16.03 | 00 - 16 - 03 | 00 - 16 - 03 | |
| 20th Oct Wed  | 16.03 - 17.20 | 00 - 00 - 00 | 00 - 00 – 00 | Shifting |
| 20th Oct Wed  | 17.20 - 24.00 | 00 - 06 - 40 | 00 - 06 - 40 | |
| 21st Oct Thur | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 22nd Oct Fri  | 00.00 - 24.00 | 01 - 00 - 00 | 01 - 00 - 00 | |
| 23rd Oct Sat  | 00.00 - 14.30 | 00 - 14 - 30 | 00 - 14 - 30 | Comp. disch. |
| | | 15 - 05 - 28 | 15 - 05 - 28 | Demurrage |

Total Demurrage 15 days 5 hours and 28 minutes

| | | |
|---|---|---|
| @ US$18,000.00 per day and pro rata | = | US$274,100.40 |
| Less 1.25% address commission | = | US$   3,426.26 |
| Due to the Owners | = | US$270,674.14 |

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN

**Vigour Shipping Sdn Bhd
of Malaysia**

         Claimants
         (Owners)

**AND**

**P and S International Inc.
of Dallas, Oregon, USA**

         Respondents
         (Charterers)

m.v. "ECO VANGUARD"

Charter Party dated Auckland 14TH July 2010

---

**FINAL ARBITRATION AWARD**

---

Exhibit 1
17 of 17